United States District Court
Southern District of Texas
**ENTERED**
June 21, 2024
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| *In re* MAGELLAN E&P HOLDINGS, INC., | § § § § | |
| Debtor, | § § | |
| OFFSHORE MARINE CONTRACTORS, | § § | CIVIL ACTION NO. H-23-3453 |
| Appellant, | § § § | |
| v. | § § | |
| RONALD J. SOMMERS, TRUSTEE, | § § § | |
| Appellee. | § § § | |

**MEMORANDUM AND OPINION**

A blowout of an offshore oil well led to disputes between the well owner, Magellan E&P Holdings; the well-control contractors, including Offshore Marine Contractors; and other Magellan creditors, over which entity should receive the insurance payments. The well owner declared bankruptcy under Chapter 11 of the Bankruptcy Code. The bankruptcy court ruled on the priority order of some of Magellan's creditors. Offshore Marine Contractors, one of the several contractors that worked to control the blowout, appeals this ruling.

Based on the record on appeal, the briefing, and the law, the court affirms the bankruptcy court. The reasons are set out below.

**I.    Background**

In August 2020, a blowout occurred at an offshore well owned by Magellan E&P Holdings, LLC. (Docket Entry No. 3 at 9). Magellan hired contractors to provide services related to the well

blowout, including Offshore Marine Contractors. (*Id.*). At the time of the blowout, Magellan held an insurance policy issued by Antares Managing Agency Limited. (Docket Entry No. 2 at 11). In February 2021, Magellan received two payments from Antares, totaling $4,825,000, intended to pay the well-control service providers. (Docket Entry No. 3 at 9). Antares also issued a reservation of rights letter stating that the payments were to go to the well-control service providers. (Docket Entry No. 2 at 15). However, Magellan controlled the decisions on which well-control service providers to pay, when to pay, and how much to pay. (Docket Entry No. 3 at 19).

Offshore Marine issued Magellan five separate invoices. (Docket Entry No. 2 at 11). Two of the invoices remain outstanding and are not at issue here. (*Id.*). Magellan issued one payment of $269,995.67 for the other three invoices in February 2021. This payment was 117, 87, and 43 days after the invoices were issued. (Docket Entry No. 3 at 9, 12). Magellan's payment was from an account it controlled that included both its existing funds and the Antares insurance proceeds payment for the well blowout. (Docket Entry No. 3 at 9). Magellan made this payment to Offshore Marine within 90 days before filing for bankruptcy protection. (Docket Entry No. 4 at 8).

The bankruptcy trustee argued in the bankruptcy court that Magellan's single payment to Offshore Marine was a voidable preferential transfer under 11 U.S.C. § 547(b). (Docket Entry No. 3 at 8). The bankruptcy court found in favor of the trustee, holding that the funds were Magellan's property at the time of transfer; the funds were not earmarked for Offshore Marine; and the payment to Offshore Marine was not in the ordinary course of Magellan's business. (Docket Entry No. 4 at 5–15). Offshore Marine appeals the bankruptcy court's determination, and objects to the admission of the trustee's expert witness's testimony and the exclusion of evidence as to insurance coverage and of other witness testimony. (Docket Entry No. 2). Each objection and argument is addressed below.

## II. The Legal Standards

### A. The Standard of Review

"[T]raditional appellate standards" apply to the district court's review on an appeal from a bankruptcy court's judgment or order under 28 U.S.C. § 158(a)." *Stern v. Marshall*, 564 U.S. 462, 475 (2011). The court reviews the bankruptcy court's conclusions of law de novo. *In re Ahern Enters., Inc.*, 507 F.3d 817, 820 (5th Cir. 2007). The bankruptcy court's findings of fact are reviewed for clear error. *Id.* "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *In re Acis Cap. Mgmt., L.P.*, 604 B.R. 484, 506 (N.D. Tex. 2019) (quoting *In re Johnson Sw., Inc.*, 205 B.R. 823, 827 (N.D. Tex. 1997)). The court reviews a bankruptcy court's evidentiary rulings for abuse of discretion. *In re SGSM Acquisition Co., LLC*, 439 F.3d 233, 239 (5th Cir. 2006). The standard of review for mixed questions of law and fact is determined by whether the answer to the question presented is best supplied through analysis of the relevant law or facts. *U.S. Bank N.A. ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018).

### B. The Standard for Voiding a Preferential Transfer

For a preference to be voided under 11 U.S.C. § 547, "it is essential that the debtor have an interest in the property transferred so that the estate is thereby diminished" by the transfer. *Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1355–1356 (5th Cir. 1986). A bankruptcy estate consists of the debtor's legal and equitable interests when the bankruptcy proceeding commences. 11 U.S.C.S. § 541(a)(1), (6). The term "interest of the debtor in property," while not defined by the Bankruptcy Code, is considered synonymous with the term "property of the estate" under § 541.13. *Diamond Offshore Co. v. Bennu Oil & Gas, LLC (In re ATP Oil & Gas*

3

*Corp.*), 540 B.R. 294, 304 (Bankr. S.D. Tex. 2015) (quoting *Begier v. I.R.S.*, 496 U.S. 53, 58 (1990)). Courts generally look to state law to determine whether property is part of the debtor's bankruptcy estate. *Butner v. United States*, 440 U.S. 48, 55 (1979).

Courts often look at which party maintained control over funds in an account as a "predominant factor in determining [the] account's ownership." *De La Pena Stettner v. Smith* (*In re IFS Fin. Corp.*), 669 F.3d 255, 262 (5th Cir. 2012); *see also Southmark Corp. v. Grosz* (*In re Southmark Corp.*), 49 F.3d 1111, 1116 (5th Cir. 1995) (holding that a payment from the debtor's checking account constituted a preferential transfer because the debtor had "unfettered discretion to pay creditors of its own choosing, including its own creditors."); *Coral Petroleum, Inc.*, 797 F.2d at 1362 (dismissing an avoidance action because the debtor "did not control the money to the extent that it became property of its estate"). "[T]he primary consideration in determining if funds are property of the debtor's estate is whether the payment of those funds diminished the resources from which the debtor's creditors could have sought payment." *De La Pena Stettner*, 669 F.3d at 263 (quoting *Southmark Corp* 49 F.3d at 1117).

### III.   Analysis

#### A.   The preferential transfer was properly voided

Offshore Marine argues that because the disputed funds were earmarked for Offshore Marine, the payment should not be voided. Earmarking is "a judicially created exception to a statutory rule" and "must be narrowly construed" as a defense in a preference action. *Campbell v. Hanover Ins. Co.* (*In re ESA Envtl. Specialists*), 709 F.3d 388, 394 n.5 (4th Cir. 2013). Earmarking occurs when a party transfers funds to a bankrupt debtor's creditor, substituting the party as the debtor's new creditor. In a transfer of earmarked funds, "no preference is created because the debtor has not transferred property of his estate; he still owes the same sum to a creditor, only the

4

identity of the creditor has changed." *Caillouet v. First Bank & Tr.* (*In re Entringer Bakeries Inc.*), 548 F.3d 344, 348 (5th Cir. 2008) (quoting *Coral Petroleum, Inc.*, 797 F.2d, 1355-56. Earmarked funds are essentially a loan by a new creditor to the debtor to pay off a specific debt. "The earmark rule requires that the party making the loan choose the recipient of the funds." *Hunter v. Society Bank & Trust* (*In re Parker Steel*), 149 B.R. 834, 853 (Bankr. N.D. Ohio 1992) (quoting *In re Hartley*, 825 F.2d 1067, 1071-72 (6th Cir. 1987)).

Physical control is not necessarily actual control. *Caillouet*, 548 F.3d at 350. The new creditor may transfer earmarked funds with the understanding that they will be used to pay the former creditor. *Id.* at 348. However, when there is no express agreement among the new creditor, former creditor, and debtor, physical control may be a factor strongly weighing against an earmarking defense. *Id.* at 350.

The funds Antares paid Magellan were not earmarked. First, the record does not show that Antares's payments were a loan to Magellan. Instead, the record shows that the payments were insurance proceeds meant to be used for purposes specified under Antares's reservation of rights letter. (Docket Entry No. 4 at 12). Second, the lender of an earmarked fund must designate a specific debt or creditor as the recipient of the funds. No evidence suggests that Antares identified Offshore Marine as its chosen recipient. Instead, the record shows that Antares required only that the payment be used to pay the well-control service providers, in no particular order. *Hunter v. Society Bank & Trust* (*In re Parker Steel*), 149 B.R. 834, 853 (Bankr. N.D. Ohio 1992); (Docket Entry No. 3 at 25). The evidence shows that Magellan made the choice to pay Offshore Marine, rather than paying at least part of the funds to the several well-control service providers with outstanding invoices. (Docket Entry No. 3 at 25–26).

5

While Offshore Marine is correct that the earmarking defense can apply to funds in the debtor's physical control, the record shows that Magellan controlled the funds in question here, precluding the earmarking defense. *Caillouet*, 548 F.3d at 348 (quoting *Coral Petroleum*, 797 F.2d, 1355-56); (Docket Entry No. 2 at 26). Even assuming that the funds were to be used exclusively to pay the well-control service providers, Magellan controlled which providers to pay, when to pay them, and how much to pay. (Docket Entry No. 3 at 25–26). While Magellan did not have complete "unfettered discretion to pay [any] creditors of its own choosing," Magellan had sufficient control over the money to have it considered property of its estate. *Southmark Corp.*, 49 F.3d at 1116; *Coral Petroleum, Inc.* 797 F.2d at 1362. In addition, there was no express agreement among the new creditor, former creditor, and debtor, one of the main factors weighing in favor of finding an earmarking defense. *Coral Petroleum*, 797 F.2d at 1355-56.

Even without considering the testimony of the trustee's expert, Karen G. Nicolaou, the record evidence shows that Magellan decided which entity within the group of potential recipients would be paid. (Docket Entry No. 3 at 13–14, 17–18, 25–26).[1] Because Magellan had control over deciding to send the funds to a particular entity within a class of potential recipients, the disputed property was the property of Magellan's bankruptcy estate.

Offshore Marine also argues that the payments were in the ordinary course of business, exempting them from being voided as a preferential transfer. The Bankruptcy Code states that a transfer is exempted from preferential transfer avoidance if "made in the ordinary course of

---

[1] Offshore Marine's argument that the Bankruptcy Court improperly ruled that evidence of whether the insurance coverage was triggered is also unavailing, both because Offshore Marine did not brief the issue with case law or record evidence, and because the record evidence shows that Antares, the insurance provider, clearly believes the insurance coverage was triggered. (Docket Entry No. 3 at 22–24). Offshore Marine has failed to show the Bankruptcy Court abused its discretion in its determinations about admissibility of evidence.

business or financial affairs of the debtor and the transferee" or "made according to ordinary business terms." 11 U.S.C. § 547(c)(2). To obtain this exemption, the party must satisfy either a subjective or objective test. The subjective test asks what is typical between the parties to determine if a payment is made in the ordinary course of business. *G.H. Leidenheimer Baking Co., v. Sharp* (*In re SGSM Acquisition Co., LLC*), 439 F.3d 233, 239 (5th Cir. 2006). When there is no history of payments between the parties, the court relies on the terms of the parties' contract. *Jubber v. SMC Elec. Prods.* (*In re C.W. Mining Co.*), 798 F.3d 983, 991 (10th Cir. 2015). Late payments "will be considered 'ordinary' only upon a showing that late payments were the normal course of business between the parties." *Logan v. Basic Distribution Corp.* (*In re Fred Hawes Org., Inc.*), 957 F.2d 239, 244 (6th Cir. 1992); *In re Xonics, Inc.*, 1986 Bankr. LEXIS 4716, *8-9 (Bankr. N.D. Ill. 1986). The second test is objective—the court "compare[s] the credit arrangements between other similarly situated debtors and creditors in the industry." *Gulf City Seafoods, Inc. v. Ludwig Shrimp Co.* (*In re Gulf City Seafoods*), 296 F.3d 363, 368 (5th Cir. 2002).

The payments to Offshore Marine fail both the subjective and objective tests. 11 U.S.C. § 547(c)(2). Because there were no prior transfers or transactions between Magellan and Offshore Marine, the court looks to the terms of the parties' contract. *Jubber v. SMC Elec. Prods.* (*In re C.W. Mining Co.*), 798 F.3d 983, 991 (10th Cir. 2015); (Docket Entry No. 3 at 37). The written agreement between Magellan and Offshore Marine called for payments within 30 days after the invoices were issued, (*id.* at 38), but no payments were made in this period. (*Id.* at 12). While late payments "will be considered 'ordinary'. . . upon a showing that late payments were the normal course of business between the parties," the record shows no prior course of business. *Logan v. Basic Distribution Corp.* (*In re Fred Hawes Org., Inc.*), 957 F.2d 239, 244 (6th Cir. 1992); *In re Xonics, Inc.*, 1986 Bankr. LEXIS 4716, *8-9 (Bankr. N.D. Ill. 1986).

The payments also fail the objective test. Offshore Marine did not present testimony or other evidence "compar[ing] the credit arrangements between other similarly situated debtors and creditors in the industry." *Gulf City Seafoods, Inc. v. Ludwig Shrimp Co.* (*In re Gulf City Seafoods*), 296 F.3d 363, 368 (5th Cir. 2002); (Docket Entry No. 3 at 33). Offshore Marine claims that the trustee's expert testified that when the Master Service Agreement and the invoice both state that the invoice should be paid within 30 days, the ordinary course is for payment to be made within 30 to 45 days. (Docket Entry No. 2 at 33). This is an incorrect reading of the transcript. The expert witness testified that "[g]enerally, if you are billing and you put net 30, net 45, you expect to get paid in net 30 or net 45." (Docket Entry No. 4 at 77). Offshore Marine also argues that the trustee's expert's testimony should not have been admitted. Even disregarding that testimony, the result is the same. Offshore Marine cannot satisfy either test to establish that the payment was made in the ordinary course of business, and so cannot exempt the disputed payment under that theory. 11 U.S.C. § 547(c)(2).

Finally, it is undisputed that "the payment of [the disputed] funds diminished the resources from which the debtor's creditors could have sought payment." *De La Pena Stettner*, 669 F.3d at 263; (Docket Entry No. 3 at 15–16). The bankruptcy court correctly found that the facts give rise to a significant fairness issue. (Docket Entry No. 4 at 14). The funds were not paid to vendors pro rata. (Docket Entry No. 3 at 31). Some vendors received no payment, others received partial payment, and others received payment in full. (*Id.*). The majority of the vendors were unpaid or only partially paid. By contrast, Magellan paid almost 50% of Offshore Marine's invoices. (*Id.*). The payments Magellan made to Offshore Marine diminished the funds available for pro rata distribution to its creditors, including the unpaid well-blowout service providers. The payments are voidable under § 547(b) as preferential payments that allow the debtor to favor one creditor

other others by transferring property to that creditor shortly before filing for bankruptcy protection. *See De La Pena Stettner*, 669 F.3d at 263.

The bankruptcy court correctly held that the payment made to Offshore Marine was a voidable preferential transfer.

### B. The evidentiary determinations were not an abuse of discretion

Decisions about admitting witness testimony are reviewed under an abuse of discretion standard. *Bresler v. Wilmington Trust Co.*, 855 F3.d 178, 189 (4th Cir. 2017). A court "abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003). Rule 26 requires that a party supplement its disclosures as information is learned. Fed. R. Civ. P. 26(e)(1)(A). There was no abuse of discretion when the bankruptcy court excluded testimony by Offshore Marine's undisclosed witnesses. Offshore Marine did not disclose its witnesses in its initial disclosures or supplement its disclosures, despite having ample time to do so. *Id.*; (Docket Entry No. 3 at 33).

Offshore Marine also objects to the testimony of Ms. Nicolaou, a certified public accountant and valuation analyst, that the insurance proceeds were the property of the estate, on the basis that the testimony was beyond the scope of Ms. Nicolaou's expert report. (Docket Entry No. 3 at 33). The bankruptcy court did not abuse its discretion in admitting the testimony. The joint pretrial stipulation stated that Ms. Nicolaou would provide "expert and fact testimony regarding the Preferential Transfers as a transfer or an interest in property." (Docket Entry No. 4 at 34). Her testimony was within the scope of the joint stipulation. The bankruptcy court considered Offshore Marine's objections and made a reasonable determination to admit the testimony.

9

**IV.     Conclusion**

The decision of the bankruptcy court is affirmed.

SIGNED on June 21, 2024, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge